### MARCUS v. BOYNTON.

#### No. 35734.

Circuit Court, Palm Beach County.

November 20, 1956, January 23 and February 25, 1958.

Potter, Langbein & Burdick, West Palm Beach, for plaintiff.

James Nemec, West Palm Beach, for defendant.

R. O. MORROW, Circuit Judge.

*November 20, 1956:* This cause comes before the court on the defendant's motion to dismiss the complaint. The question presented is the sufficiency of the allegations upon which to base a claim for a resulting trust.

Though the allegations are meager, they appear to meet the requirements of Thompson v. Field, 54 So. 2d 520, wherein it was held that one "who had paid one-half the purchase price thereof" was sufficient.

The motion to dismiss is denied. The defendant shall have 10 days in which to further plead, and the plaintiff 10 days thereafter in which to reply.

*January 23, 1958:* This cause comes on for final decree and trial having been had before the court and the court having heard all the testimony, read the depositions of Hyman Gold, and examined all documents admitted in evidence finds—

Plaintiff, Robert Marcus, brings suit as administrator of the estate of Daniel Marcus, deceased, and seeks to have the court decree that the defendant Marian R. Boynton, holds the following described real property in trust for the plaintiff—lot 7, Lake Forest Park, per plat book 24, page 76, Palm Beach County records.

The defendant denies the allegations, affirmatively pleads release. The deceased had been married to one Marian Marcus for a number of years, they were divorced and later remarried in 1947. One son, the plaintiff herein, was born of this marriage. After the remarriage they separated, some time in late 1952 or early 1953. The deceased paid support to his wife in different amounts and in December 1954 the parties executed an agreement which recited that they had separated and were living separate and apart and providing for specific support for the wife.

Daniel Marcus died on January 15, 1956 and within a few days thereafter his New York attorney, Hyman Gold, and plaintiff Robert Marcus came to West Palm Beach to discover and take possession of the assets of his estate. Certain bank accounts, jewelry, insurance policies, government bonds, tax returns and miscellaneous records were turned over to the administrator. During this investigation Hyman Gold talked to the defendant, who was in a hospital at the time, and she told him of the real property which is the subject matter of this suit.

On October 5, 1954 the Florida National Bank & Trust Co. issued its cashier's check to Daniel Marcus in the sum of $7,620, which was endorsed by Daniel Marcus and Marian R. Boynton (plaintiff's exhibit #7). On November 4, 1954 a savings and loan association check for $10,141.65 was issued to Daniel Marcus and endorsed by Daniel Marcus and Marian R. Boynton (plaintiff's exhibit #8). The second endorsement shows that Mrs. Boynton received this money at the time these checks were cashed.

On September 7, 1954 Mrs. Boynton issued a check to the Southlake Corporation for $1,400 as a binder on the purchase of the described property (see plaintiff's exhibits 2 and 3). On December 27, 1954 the Southlake Corporation executed a deed to Marian R. Boynton conveying the property in question (plaintiff's exhibit #1).

The court further finds that the deceased hired Hyman Gold as his personal attorney and commencing about mid-year 1953, Hyman Gold acted as intermediary between the deceased and his wife. The deceased was meticulous and successful in arranging his affairs to prevent his wife from knowing his whereabouts. Hyman Gold was an astute man and very capable mentally.

Plaintiff contends that the money that went into the purchase of the property was the money of Daniel Marcus, that it was placed in the name of Marian R. Boynton as a convenience, that it was actually the property of the deceased and that therefore the plaintiff is entitled to the property under the law of resulting trusts.

The court finds from the evidence and testimony that the money represented by plaintiff's exhibits 7 and 8, as well as certain other money, was money given by the deceased to Mrs. Boynton, and that the same was an absolute gift, under her sole control. Further, that a goodly portion of said money was used in the purchase of the property in question, and that the described property was, and is, the property of Marian R. Boynton.

The testimony of John A. Schwenke and John A. Kearney, salesmen for the corporation which sold the property to Mrs. Boynton, supports the conclusion that the property was the property of Mrs. Boynton. The plaintiff has taken one statement out of Schwenke's testimony—"If anything happened to him, he wanted to be sure Mrs. Boynton would have the house." This statement is that of Daniel Marcus at the time of the purchase of the property.

The plaintiff contends that this is proof that the deceased considered the property was his and not Mrs. Boynton's. The court cannot agree. Construing all the testimony, the court finds that it supports the proposition that the property belonged to Mrs. Boynton. Let us take the isolated statement above, as plaintiff has done, and we note that Daniel Marcus did not say—"he wanted to be sure Mrs. Boynton would *get* the house." In other words, he wanted to be sure that she would continue to have the house and that no one would be able to take it from her.

The meticulousness with which the deceased conducted his business and kept his whereabouts unknown is indicative of his thoroughness in making the money gift to Mrs. Boynton. The record discloses that certain property, particularly government bonds, were in the name of the deceased—this property he gave to no one, but retained for his own security. The deceased was specific in what he gave, and what he retained.

With reference to the affirmative defense of release, the plaintiff contends that the release (defendant's exhibit # 1) and the agree-

ment between the attorneys for the parties hereto (plaintiff's exhibit #13), should be read together and that the agreement limited the effect of the release to the matters listed in the agreement. The court has no quarrel with the contention that the two documents should be read together, and the court has so read the documents, however, the further contention of the plaintiff is that the plaintiff, and particularly the plaintiff's New York attorney, did not know the facts and circumstances with reference to the real property in question and that the New York attorney, by stipulation filed before the court, January 14, 1958, attached to his affidavit, shows that he was continuing to seek assets of the estate, as much as three months after the release and agreement, as aforesaid, had been signed.

The court is of the opinion that said attorney should continue to search for the assets of the estate but that such operation should not nullify the effect of the release. Within one week after the death of Daniel Marcus, as stated heretofore, his attorney and his son were investigating the assets of the estate, and properly so, the attorney learned of the real property, got its legal description and checked the record. They checked the bank accounts and bank records. That was January, 1956. On February 16, 1956 the New York attorney and counsel herein wrote the defendant's attorney stating, among other things—"If there is anything further of which you can inform me, such as confirmation that the purchase price of the house was furnished by Mr. Marcus, or of any other items of property formerly belonging to him and now to Mrs. Boynton, it will aid me." (Defendant's exhibit #7.)

There is no doubt that counsel knew of the house and had made investigation as to the source of the purchase price at the time the release and agreement were executed and exchanged on February 13, 1956. The release was not obtained by fraud, misrepresentation or duress. Valuable properties belonging to the decedent were delivered to counsel for the plaintiff and all matters of knowledge to both parties were settled, including the real property in question, at the time of the execution of the release and said agreement.

It is therefore ordered that plaintiff's complaint is dismissed with prejudice, and the costs herein are taxed against the plaintiff.

*February 25, 1958:* This cause comes before the court on defendant's motion to tax the costs and strike the lis pendens.

It is ordered and adjudged that the costs herein in the sum of $19.50 are taxed against the plaintiff, for which let execution issue; further, that the lis pendens filed herein is hereby canceled and held for naught.